NATION FORD CHEMICAL COMPANY, Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee,

and

Yude Chemical Company, Zhenxing Chemical Industry Company and PHT International, Inc., Defendants–Appellees.

Nos. 98–1253, 98–1254.

United States Court of Appeals, Federal Circuit.

Feb. 2, 1999.

Stephen A. Jones, King & Spalding, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Martin M. McNerney.

Reginald T. Blades, Jr., Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant-appellee, United States. With him on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Berniece A. Browne, and Linda S. Chang, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

William E. Perry, Williams, Mullen, Christian & Dobbins, P.C., of Washington, DC, argued for defendants-appellees, Yude Chemical Company, et al.

Before RICH, NEWMAN, and LOURIE, Circuit Judges.

LOURIE, Circuit Judge.

Nation Ford Chemical Company ("NFC") appeals from the decision of the United States Court of International Trade sustaining the Department of Commerce's use of Indian import prices for aniline in its investigation of certain Chinese manufacturers accused of dumping sulfanilic acid in the United States. *See Nation Ford Chem. Co. v. United States*, 985 F.Supp. 133 (Ct. Int'l Trade 1997) ("*NFC I*"). We affirm.

## BACKGROUND

NFC is the only manufacturer of sulfanilic acid in the United States. NFC suspected that various manufacturers from the People's Republic of China were "dumping" sulfanilic acid in the United States and successfully petitioned Commerce to investigate those manufacturers' activities from August 1, 1993 to June 31, 1995.[1] *See Sulfanilic Acid From the People's Republic of China; Preliminary Results of Antidumping Duty Administrative Review*, 61 Fed.Reg. 25196 (1996) ("*1993–94 Preliminary Results*"); *Sulfanilic Acid From the People's Republic of China; Preliminary Results and Partial Rescission of Antidumping Administrative Review*, 61 Fed.Reg. 29073 (1996) ("*1994–95 Preliminary Results*"). In its investigation, Commerce sought to determine the "dumping margin," *i.e.*, "the amount by which the foreign market value exceeds the United States price" for that product. *See* 19 U.S.C. § 1673 (1988);[2] *see also id.* § 1677a (defining

---

1. The petition was filed by R–M Industries, NFC's predecessor company. Although R–M Industries had petitioned Commerce to investigate the Chinese exporter's activities in other years as well, only the determinations for the 1993–94 and 1994–95 years have been appealed.

2. Section 1673 and other related sections were amended in 1994 to substitute "normal value" for "foreign market value" and "export price (or constructed export price)" for "United States price." We refer to the older terminology because it was in force at the time the investigations were filed. *See* 19 U.S.C.A. § 1673 note

"United States price"); *id.* § 1677b (defining "foreign market value"); *Aimcor v. United States,* 141 F.3d 1098, 1101 (Fed.Cir.1998) (noting that the "dumping margin" constitutes a duty on imported merchandise that is designed to "raise the United States price to the foreign market value.") (citation omitted).

Finding China to be a "nonmarket economy" country or "NME," [3] Commerce applied 19 U.S.C. § 1677b(c) to determine the "foreign market value." This provision reads as follows:

(1) In general

If—

    (A) the subject merchandise is exported from a nonmarket economy country, and

    (B) [Commerce] finds that available information does not permit the foreign market value of the subject merchandise to be determined under subsection (a) of this section,

[Commerce] shall determine the foreign market value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise.... [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administrator.

    .    .    .    .    .

(3) For purposes of paragraph (1), the factors of production utilized in producing merchandise include, but are not limited to—

    (A) hours of labor required,

    (B) quantities of raw materials employed,

    (C) amounts of energy and other utilities consumed, and

    (D) representative capital costs, including depreciation.

(4) [Commerce], in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the price or costs of factors of production in one or more market economy countries that are—

    (A) at a level of economic development comparable to that of the nonmarket economy country, and

    (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c) (1988). Pursuant to paragraph (4), Commerce chose India as the market economy "surrogate country." *See 1993–94 Preliminary Results,* 61 Fed.Reg. at 25198; *1994–95 Preliminary Results,* 61 Fed.Reg. at 29076. Thus, Commerce's task was to assess the "price or costs" of factors of production of sulfanilic acid in India in an attempt to construct a hypothetical market value of that product in China.

The "factors of production" assessment brought the cost of aniline, one of the raw materials used in the production of sulfanilic acid, into question. The record evidence shows that India protected its domestic aniline industry from global competition with an 85% import tariff, and that this tariff caused the price of domestically-produced aniline to be inflated. Pursuant to India's Advanced License Program,[4] this tariff, however, was not paid by Indian sulfanilic acid producers if they used the aniline to produce sulfanilic acid for export. Not surprisingly, Indian sulfanilic acid producers who exported their product bought imported aniline instead of domestic aniline because it was less expensive. In contrast, the Chinese sulfanilic acid

(1980 & Supp.1998) (noting that the 1994 amendments apply to investigations filed after January 1, 1995).

**3.** A nonmarket economy country is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that the sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(a) (1988). No party to the investigation disputed that China was a nonmarket economy country.

**4.** "Under this program, advance licenses are available to exporters to enable them to import raw material inputs used in the production of exports duty-free." *Preliminary Affirmative Countervailing Duty Determination: Sulfanilic Acid From India,* 57 Fed.Reg. 35784, 35784 (1992).

manufacturers under investigation only procured aniline from its own domestic sources. The parties do not dispute that the foregoing are accurate descriptions of the Indian and Chinese aniline and sulfanilic acid markets during the relevant time periods.

In its preliminary determinations, Commerce valued aniline using a published Indian import price, *viz.*, the price that an Indian sulfanilic acid producer would pay to have aniline imported into India, with appropriate adjustments that are not relevant here. *See 1993–94 Preliminary Results*, 61 Fed.Reg. at 25198; *1994–95 Preliminary Results*, 61 Fed.Reg. at 29076. NFC argued that this value was too low and that Commerce should have used Indian domestic prices instead, *viz.*, the price that an Indian sulfanilic acid producer would have to pay to an Indian producer of aniline. Commerce, in its final determinations, disagreed: "The evidence placed on the record ... indicates that Indian sulfanilic acid producers use imported aniline in their production process when they produce sulfanilic acid for export. Therefore, these values best approximate the cost incurred by the sulfanilic acid exporters in India...." *Sulfanilic Acid from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 61 Fed.Reg. 53711, 53715 (1996) ("*1993–94 Final Results*"); *Sulfanilic Acid from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Review Administrative Review*, 61 Fed.Reg. 53702, 53704 (1996) ("*1994–95 Final Results*").

NFC argued in the alternative that the aniline import price should be increased to include both the 85% import duty and importer "mark-up" costs, but Commerce again disagreed. Concerning the 85% import duty, Commerce noted that the duty was not paid by Indian sulfanilic acid producers who produced the product for export. *See 1993–94 Final Results*, 61 Fed.Reg. at 53716; *1994–95 Final Results*, 61 Fed.Reg. at 53705. Concerning importers' "mark-up" costs, Commerce stated: "There is no evidence on the record ... indicating who imports the aniline, the sulfanilic acid producer or an importer who sells the aniline to the sulfanilic

acid producer. Accordingly, there is no basis for determining that an importer's markup would be included in the price to the Indian sulfanilic acid producer and for adjusting the surrogate value for such a markup." *1993–94 Final Results*, 61 Fed.Reg. at 53716; *1994–95 Final Results*, 61 Fed.Reg. at 53705. Commerce ultimately calculated the dumping margin for each of the Chinese producers and assessed appropriate duties. *See 1993–94 Final Results*, 61 Fed.Reg. at 53718; *1994–95 Final Results*, 61 Fed.Reg. at 53711.

NFC appealed to the Court of International Trade, which sustained Commerce's determinations for each of the years in question. *NFC I*, 985 F.Supp. 133 (Ct. Int'l Trade 1997). NFC then appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## DISCUSSION

■ In reviewing a decision of the Court of International Trade, this court applies anew the statutory standard of review applied by that court to the agency's decision. *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236, 11 Fed. Cir. (T) 9, 13 (Fed. Cir.1992). Therefore, we must affirm the court's decision unless we conclude that the agency's determination was not supported by substantial evidence or was otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b) (1994). Statutory construction is a question of law that we review de novo. *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1121 (Fed.Cir.1998).

NFC argues that it was improper for Commerce to use an Indian import price to value aniline in its "factors of production" assessment. NFC contends that § 1677b(c) mandates that an Indian domestic price be used because the Chinese producers indisputably use domestically-produced aniline. NFC supports its interpretation by noting that § 1677b(c) states that the assessment shall be based on "the values of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1). NFC attempts to further strengthen its argument by noting that Commerce used domestic prices to value other materials used in the production of sulfanilic acid, and argues that it is inconsistent for

Commerce not to do the same for aniline. Finally, NFC contends that the use of imported prices is especially inappropriate in this case because India's Advanced License Program has been adjudged by Commerce to be an illegal countervailable subsidy. *See Sulfanilic Acid from India,* 57 Fed.Reg. 35784, 35784–85 (1992).

The government and Chinese manufacturers respond that § 1677b(c) does not mandate that Commerce use an Indian domestic price for aniline merely because Chinese manufacturers use domestically-produced aniline. Instead, the government points out that § 1677b(c) prescribes that Commerce use the "best available information" from the surrogate country, and contends that Commerce has the discretion to use whatever values are appropriate from the surrogate country as long as those values are the most reflective of the experience of the NME producer. The government thus contends that it was appropriate for Commerce to have rejected Indian domestic prices for aniline as unreliable because they were distorted by high tariffs, and argues that these distortions should not be incorporated into the Chinese sulfanilic acid market through the application of § 1677b(c). The government also contends that it was not inconsistent for Commerce to use domestic prices for some production materials and import prices for others. Finally, the government contends that whether the Advanced License Program constitutes illegal subsidization of sulfanilic acid is irrelevant to the valuation of aniline.

We have previously noted that "the process of constructing foreign market value for a producer in a nonmarket economy country is difficult and necessarily imprecise." *Sigma Corp. v. United States,* 117 F.3d 1401, 1407 (Fed.Cir.1997). While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines. *See Lasko Metal Prods., Inc. v. United States,* 43 F.3d 1442, 1446 (Fed.Cir.1994) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and *Suramerica de Aleaciones Lami-*

*nadas, C.A. v. United States,* 966 F.2d 660, 665, 10 Fed. Cir. (T) 74, 80 (Fed.Cir.1992)); *see also Magnesium Corp. of Am. v. United States,* 166 F.3d 1364, 1372 (Fed.Cir.1999) (noting that § 1677b(c) "gives Commerce broad discretion in valuing the factors of production on which factory overhead is based," and holding that a factors of production analysis "does not require item-by-item accounting for factory overhead.").

■ NFC is incorrect that § 1677b(c) "mandates" that Commerce use a surrogate country's domestic price if the NME country procures the valued material domestically. The statute is more flexible: it mandates that Commerce value the factors of production on the basis of "the *best available information regarding the values* of such factors in a market economy country." 19 U.S.C. § 1677b(c)(1) (emphasis added). The "best available information" concerning the valuation of a particular factor of production may constitute information from the surrogate country that is directly analogous to the production experience of the NME producer—in this case, procurement of aniline from domestic sources—or it may not. Whether such analogous information from the surrogate country is "best" will necessarily depend on the circumstances, including the relationship between the market structure of the surrogate country and a hypothetical free-market structure of the NME producer under investigation. As aptly stated by the Court of International Trade, while "a surrogate value must be as representative of the situation in the NME country as is feasible," Commerce need not "duplicate the exact production experience of the [Chinese] manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of aniline in a [hypothetical] market-economy [China]." *NFC I,* 985 F.Supp. at 137; *see also Lasko,* 43 F.3d at 1446 (observing that § 1677b(c) "simply does not say—anywhere—that the factors of production must be ascertained in a single fashion.").

NFC does not explain why Commerce should have used the Indian domestic price, a price admittedly distorted by the Indian tar-

iff, in the valuation of aniline when the Chinese producers would not have been expected to live with a similar distortion were they to operate in a free market. Not only is NFC's approach inconsistent with § 1677b(c)'s goal of constructing a hypothetical "market value" representative of the foreign producers under investigation, it is also at odds with the intent of Congress, which warned that Commerce should avoid the use of distorted surrogate prices. *See* H.R. Conf. Rep. 100–576, at 590 (1988), U.S. Code Cong. & Admin. News 1988 at 1547, 1623 (when performing a factors of production assessment, "Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices."). There is no reason, either under § 1677b(c) or in logic, to incorporate the distortions in the Indian aniline market into a hypothetical Chinese market pursuant to a factors of production assessment merely because India has been chosen as the surrogate country. A tariff, which is a governmentally-decreed addition to the cost of production of a product, is not a factor of production.

We also disagree with NFC that Commerce should have used Indian domestic prices in its valuation of aniline merely because it used domestic prices to value other materials used in the production of sulfanilic acid. Again, § 1677b(c) merely requires the use of the "best available information" with respect to the valuation of a given factor of production; it does not require that a uniform methodology be used in the valuation of all relevant factors. Commerce stated that "we believe that we can use different sources for valuing different factors" when it finds that such sources are appropriate under the circumstances. *1993–94 Final Results*, 61 Fed.Reg. at 53715; *1994–95 Final Results*, 61 Fed.Reg. at 53705. We agree, because § 1677b(c) accords Commerce that discretion.

NFC's argument that the use of the Indian import price is improper in light of Commerce's previous determination that the Indian government had illegally subsidized the production of sulfanilic acid is similarly unconvincing. Even if true, this fact is irrelevant to the valuation of aniline in a hypothetical free-market China. NFC has not pointed to any evidence of record that shows that the Indian import price for aniline was distorted and would not reflect the price that would be paid by a hypothetical Chinese sulfanilic acid producer operating under free-market principles. In fact, NFC, in an auxiliary argument, asserts that Commerce erred in using the Indian import price because such a price is reflective of a "world market price,"[5] which if anything suggests that the Indian import price was competitive, not distorted. In summary, substantial evidence supports Commerce's conclusion that Indian import prices constituted the "best available information" bearing on the price of aniline in a hypothetical free-market China.

Finally, we reject NFC's alternative argument that, even if Commerce did not err in using the Indian import price, that price should be increased to include both the 85% import tariff and certain importer "mark-up" costs. NFC's argument concerning the inclusion of the 85% tariff fails for two reasons. First, just as it would have been unjustified for Commerce on this record to have used an inflated Indian domestic price in lieu of a non-distorted import price, it would have been unjustified to have included the import tariff. The tariff is unique to India, and no evidence suggests that a hypothetical free-market Chinese sulfanilic acid producer would be subject to similar requirements. Second, NFC ignores the reality that *Indian* sulfanilic acid producers do not pay the 85% duty on aniline when they, like the Chinese producers, manufacture for export.

NFC's argument concerning importer mark-up also fails. As Commerce noted,

**5.** Without needless elaboration, we reject this auxiliary argument, *viz.*, that Commerce erred in using the Indian import price because such a price is reflective of a world market price and not a price specific to the surrogate country. The statute does not preclude consideration of pricing or costs beyond the surrogate country if necessary. *See* 19 U.S.C. § 1677b(c)(4) (noting that Commerce should use prices or costs in the surrogate country or countries "to the extent possible."); *see also* 19 C.F.R. § 351.408(c)(2) (1998) (Commerce "*normally* will value all factors in a single surrogate country.") (emphasis added). Thus, a world market price is not precluded from being the best available information concerning a factor of production.

NFC points to no evidence showing if or how such costs are passed on to the Indian sulfanilic acid producers. In any event, importer mark-up costs enjoy no parallel in a hypothetical free-market China because the record evidence shows that Chinese sulfanilic acid producers procure aniline from *domestic* sources.

## CONCLUSION

Having concluded that NFC's construction of § 1677b(c) is untenable, and that substantial evidence supports Commerce's determination that Indian import prices exclusive of duties or mark-ups were the "best available information" concerning the valuation of aniline in a hypothetical free-market China, the decision of the Court of International Trade is

*AFFIRMED.*