# United States Court of Appeals for the Federal Circuit

---

**SEAH STEEL VINA CORPORATION,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, UNITED STATES STEEL CORPORATION,**
*Defendants-Appellees*

**TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., BOOMERANG TUBE LLC, ENERGEX TUBE (A DIVISION OF JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, MAVERICK TUBE CORPORATION,**
*Defendants*

---

2019-1091

---

Appeal from the United States Court of International Trade in Nos. 1:14-cv-00224-RWG, 1:14-cv-00259-RWG, Senior Judge Richard W. Goldberg.

---

SEALED OPINION ISSUED: January 27, 2020
PUBLIC OPINION ISSUED: February 14, 2020*

---

* This opinion was originally filed under seal and has been unsealed in full.

————————————

JEFFREY M. WINTON, Law Office of Jeffrey M. Winton PLLC, Washington, DC, argued for plaintiff-appellant.

DOUGLAS GLENN EDELSCHICK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by JOSEPH H. HUNT, CLAUDIA BURKE, JEANNE DAVIDSON; BRENDAN SASLOW, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

THOMAS M. BELINE, Cassidy Levy Kent USA LLP, Washington, DC, argued for defendant-appellee United States Steel Corporation. Also represented by MYLES SAMUEL GETLAN, SARAH E. SHULMAN, JAMES EDWARD RANSDELL, IV.

————————————

Before NEWMAN, SCHALL, and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant SeAH Steel VINA Corporation ("SeAH") sued Appellee the United States ("Government") in the U.S. Court of International Trade ("CIT"), challenging the U.S. Department of Commerce's ("Commerce") final determination of an antidumping duty investigation covering certain oil country tubular goods ("OCTG") from the Socialist Republic of Vietnam ("Vietnam"). *See Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam*, 79 Fed. Reg. 41,973, 41,973 (July 18, 2014) (final determination) ("*Final Determination*"), as amended by *Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam*, 79 Fed. Reg. 53,691 (Sept. 10, 2014) (order and amended final determination). The CIT remanded the case

twice to Commerce, *SeAH Steel VINA Corp. v. United States* (*SeAH I*), 182 F. Supp. 3d 1316, 1345 (Ct. Int'l Trade 2016); *SeAH Steel VINA Corp. v. United States* (*SeAH II*), 269 F. Supp. 3d 1335, 1365 (Ct. Int'l Trade 2017), and sustained Commerce's second redetermination on remand, *see SeAH Steel VINA Corp. v. United States* (*SeAH III*), 332 F. Supp. 3d 1314, 1318 (Ct. Int'l Trade 2018) (Opinion and Order); *see also* J.A. 3011–46 (*Redetermination II*); J.A. 2942–69 (*Redetermination I*).

SeAH appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We affirm-in-part, reverse-in-part, and remand.

## BACKGROUND

### I. Legal Framework

Antidumping duties may be imposed on "foreign merchandise" that "is being, or is likely to be, sold in the United States at less than its fair value." 19 U.S.C. § 1673 (2012).[1] Antidumping duties are a trade remedy "imposed to protect [domestic] industries against unfair trade practices." *Canadian Wheat Bd. v. United States*, 641 F.3d 1344, 1351 (Fed. Cir. 2011). Domestic industries may seek "relief from imports that are sold in the United States at less than fair value," *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1368 (Fed. Cir. 2002), by filing a petition with

---

[1]    In June 2015, Congress amended the statutes containing the antidumping provisions. *See* Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, §§ 501–07, 129 Stat. 362, 383–87. While we review the *Final Determination* in accordance with the TPEA because it issued after the TPEA became effective, unless stated otherwise, we cite to the U.S. Code version of the statute as there are no material changes in the TPEA for purposes of this appeal. *See Juancheng Kangtai Chem. Co. v. United States*, 932 F.3d 1321, 1323 n.1 (Fed. Cir. 2019).

Commerce and the U.S. International Trade Commission ("ITC") to initiate an antidumping duty investigation, *see* 19 U.S.C. §§ 1673a(b), 1677(9)(C). Following investigation, if Commerce determines that imported merchandise "is being, or is likely to be, sold in the United States at less than its fair value," *id.* § 1673(1), and the ITC determines that the importation or sale of that merchandise has "materially injured" or "threaten[s]" to "materially injur[e]" an industry in the United States, *id.* § 1673(2), then Commerce will "publish an antidumping duty order . . . direct[ing] [U.S. Customs and Border Protection] to assess . . . antidumping dut[ies]" on subject merchandise, *id.* § 1673e(a)(1).

Commerce "determine[s] the estimated weighted average dumping margin for each exporter and producer individually investigated" and "the estimated all-others rate for all exporters and producers not individually investigated." *Id.* § 1673d(c)(1)(B)(i). A dumping margin reflects the amount by which the "'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States) or 'constructed export price.'" *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (footnote omitted) (citing 19 U.S.C. § 1677(35)(A)); *see* 19 U.S.C. §§ 1677b(a)(1) (defining "normal value" as "the price at which the [merchandise] is first sold . . . for consumption" in the home country or third country), 1677a(b) (defining "constructed export price" as "the price at which the subject merchandise is first sold . . . in the United States" to "a purchaser not affiliated with the producer or exporter").

If Commerce finds that the exporting country is a "non-market economy" ("NME") country[2] and "that available

---

[2]    An NME country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the

information does not permit the normal value of the subject merchandise to be determined under [§ 1677b(a)]," then Commerce calculates normal value using surrogate values for the "factors of production" in a comparable "market economy country." *Id.* § 1677b(c)(1).[3]  Further, "[b]ecause firms have 'general expenses and profits' not traceable to a specific product, in order to capture these expenses and profits, Commerce must factor [surrogate values for] (1) factory overhead ('overhead'), (2) selling, general and administrative expenses ('SG&A'), and (3) profit into the calculation of normal value"—that is, the respondent's "financial ratios." *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1300 (Ct. Int'l Trade 2006) (quoting 19 U.S.C. § 1677b(c)(1)).  Commerce may, similarly, adjust export price or constructed export price using surrogate values for "movement expenses." *Prelim. I&D Memo* at 10–11; *see* 19 U.S.C. § 1677a(c)(2)(A) (instructing Commerce to adjust constructed export price by, inter alia, "the amount . . . attributable to any additional costs, charges, or expenses . . . incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States"); *Fine Furniture (Shanghai) Ltd. v. United States*, 182 F. Supp. 3d 1350, 1368 (Ct. Int'l Trade 2016) (explaining that

---

merchandise." 19 U.S.C. § 1677(18)(A).  Commerce "considers Vietnam to be [an NME] country[.]" *Certain Oil Country Tubular Goods from the Socialist Republic of Vietnam*, Issues & Decision Mem., A-552-817, POI Jan. 1, 2013–June 30, 2013 (Feb. 14, 2014) (adopted in 79 Fed. Reg. 10,478 (Feb. 25, 2014)) ("*Prelim. I&D Memo*") at 6.

[3]   Specifically, Commerce must value the factors of production "to the extent possible . . . in one or more market economy countries that are—(A) at a level of economic development comparable to that of the [NME] country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

Commerce will use "a surrogate value for [movement] expenses" for NME respondents).

In selecting surrogate values, Commerce "attempts to construct a hypothetical market value of [the subject merchandise] in the [NME]." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015) (internal quotation marks, alterations, and citation omitted). Commerce's surrogate value determinations must "be based on the best available information regarding the values of [relevant] factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1); *see id.* § 1677b(a) (providing that Commerce constructs the "normal value" "to achieve a fair comparison with the export price"). "Commerce has broad discretion to determine" what constitutes "the best available information," as this term "is not defined by statute." *QVD Food Co. v. United States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011). Commerce "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Qingdao Sea–Line Trading Co. v. United States,* 766 F.3d 1378, 1386 (Fed. Cir. 2014) (footnote omitted).

## II. Procedural History

In July 2013, Commerce "received antidumping duty . . . petitions concerning imports of certain [OCTG] from," inter alia, Vietnam, from domestic producers, including U.S. Steel Corporation ("U.S. Steel"), Maverick Tube Corporation, TMK IPSCO, Vallourec Star L.P., and Welded Tube USA Inc. (collectively, "Petitioners"). *Certain Oil Country Tubular Goods from India, the Republic of Korea, the Republic of the Philippines, Saudi Arabia, Taiwan, Thailand, the Republic of Turkey, Ukraine, and the Socialist Republic of Vietnam*, 78 Fed. Reg. 45,505, 45,506 (July 29, 2013) (initiation of antidumping duty investigations). Petitioners alleged sales of OCTG "at less than fair value" and "material injury to [the] industry in the United

States." *Id.* Commerce initiated an investigation. *Id.* at 45,505.

Commerce "issued quantity and value . . . questionnaires to the eight companies named in the [P]etition," but received timely responses from only two—one of which was SeAH. *Prelim. I&D Memo* at 2. Commerce selected SeAH and the other responsive company as mandatory respondents. *Id.*; *see* 19 U.S.C. § 1677f-1(c)(2) (explaining when Commerce may limit its review to a "reasonable number of exporters or producers"). In February 2014, Commerce issued its preliminary determination. *Certain Oil Country Tubular Goods From the Socialist Republic of Vietnam*, 79 Fed. Reg. 10,478, 10,479 (Feb. 25, 2014) (preliminary determination). Because Commerce "considers Vietnam to be [an NME] country," Commerce selected a surrogate market economy country, India, to provide surrogate values. *Prelim. I&D Memo* at 6, 11; *see also* 19 U.S.C. § 1677b(c)(1) (providing for the use of surrogate values to calculate normal value for NME respondents).

In July 2014, Commerce issued its *Final Determination*. 79 Fed. Reg. at 41,973. Commerce calculated a 24.22% dumping margin for SeAH. *Id.* at 41,975. Commerce based this margin on various surrogate values. *See* J.A. 2203–06 (explaining Commerce's selection of Welspun Corporation Limited's ("Welspun") financial statements for calculation of surrogate financial ratios, for SeAH's normal value), 2226–27 (declining to deduct a surrogate value for domestic inland insurance from SeAH's constructed export price); *see also* J.A. 2188–95 (selecting the World Bank's Doing Business 2014: India ("*Doing Business Report*") as the best available information for brokerage and handling ("B&H") surrogate values[4] and explaining Commerce's

---

[4]    Here, B&H costs are, specifically, costs for "[d]ocument[] preparation" and "[c]ustoms clearance and technical control" for SeAH's imported inputs and exported

allocation of B&H costs, for adjustments to SeAH's normal value and constructed export price).

Both SeAH and Petitioners sued the Government in the CIT, challenging Commerce's *Final Determination* as unsupported by substantial evidence, each arguing for the use of different surrogate values for SeAH's margin calculation. *SeAH I*, 182 F. Supp. 3d at 1322; *see* J.A. 185 (Docket) (listing SeAH's complaint before the CIT), J.A. 187 (Docket) (listing order consolidating SeAH's case with U.S. Steel's case before the CIT). The CIT remanded to Commerce twice, for "reconsider[ation]" and "further explanation" of its surrogate value determinations. *SeAH I*, 182 F. Supp. 3d at 1330, 1335; *see SeAH II*, 269 F. Supp. 3d at 1347, 1358–59. On remand, Commerce calculated a 61.04% dumping margin for SeAH. J.A. 3046; *see* J.A. 2961–64 (on voluntary remand, setting aside Welspun's financial statements in favor of Bhushan Steel Limited's ("Bhushan") financial statements); J.A. 2955–58 (deciding to adjust SeAH's constructed export price for inland insurance), 3017–21, 3033–37 (using modified inland insurance surrogate values from Agro Dutch Industries, Ltd. ("Agro Dutch")); J.A. 2977–83, 3024–28, 3037–45 (providing further explanation of Commerce's B&H surrogate value by-weight allocation methodology). The CIT sustained Commerce's *Final Determination,* as amended by *Redeterminations I* and *II*, finding "Commerce's determinations . . . supported by substantial evidence," and entered final judgment for the Government. *SeAH III*, 332 F. Supp. 3d at 1330–31; *see SeAH II*, 269 F. Supp. 3d at 1365.

## DISCUSSION

SeAH contends that Commerce's margin calculation was unsupported by substantial evidence and not in

---

subject merchandise. J.A. 1923 (exports), 2235–36 (imports).

accordance with law because: (1) Commerce's "selection of [Bhushan] for surrogate 'financial ratios'" for SeAH's normal value "distorted the relevant overhead costs and administrative expenses without providing a meaningful . . . profit figure," Appellant's Br. 47 (capitalization normalized); (2) Commerce's "determination to include an additional surrogate amount for . . . inland insurance" for SeAH's constructed export price is "unsupported by the record evidence," *id.* at 44 (capitalization normalized); and (3) Commerce's allocation methodology for surrogate B&H costs for SeAH's normal value and constructed export price was "unsupported by the record evidence," *id.* at 55 (capitalization normalized). We address each argument in turn.

## I. Standard of Review

We apply the same standard of review as the CIT, *see Downhole Pipe*, 776 F.3d at 1373, upholding Commerce's determinations if they are supported "by substantial evidence on the record" and otherwise "in accordance with law," 19 U.S.C. § 1516a(b)(1)(B)(i). "Although we review the decisions of the CIT de novo, we give great weight to the informed opinion of the CIT and it is nearly always the starting point of our analysis." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016) (internal quotation marks, alterations, and citation omitted). Substantial evidence is "more than a mere scintilla"; rather it is such "evidence that a reasonable mind might accept as adequate to support a conclusion." *Downhole Pipe*, 776 F.3d at 1374 (internal quotation marks and citations omitted). "We look to the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (internal quotation marks and citation omitted).

10          SEAH STEEL VINA CORPORATION v. UNITED STATES

II. Commerce's Selection of Bhushan for Surrogate Financial Ratios Is Supported by Substantial Evidence and Otherwise in Accordance with Law

In its *Final Determination*, Commerce selected Welspun's, not Bhushan's, financial records as the "best available information on the record" for SeAH's surrogate financial ratios. J.A. 2206; *see* J.A. 2205–06 (selecting Welspun as "a producer of OCTG," with the closest available "production processes" to SeAH and a "financial statement [that] is contemporaneous, publically available, and evidences no receipt of countervailable subsidies"). However, following voluntary remand and the submission of additional evidence, Commerce found that there was "insufficient evidence to conclude that Welspun is actually a producer of [OCTG]." J.A. 2962. Commerce determined that Bhushan, a company it had previously disqualified because "its production process was not sufficiently similar" to SeAH, was acceptable because there was "no superior option . . . available on the record." J.A. 2963–64; *see* J.A. 2205 (disqualifying Bhushan, in the *Final Determination,* "because its production process is not sufficiently similar to [SeAH's]"). Commerce explained that Bhushan was the "best [available] information on the record" because "Bhushan produces [OCTG] and their financial statements are publicly available and contemporaneous with the [period of investigation ('POI')]." J.A. 2964. The CIT sustained this determination as a "reasonable exercise of [Commerce's] wide discretion to choose from among imperfect options." *SeAH II*, 269 F. Supp. 3d at 1350 (internal quotation marks omitted). SeAH argues that Commerce's selection of Bhushan was "patently unreasonable," Appellant's Br. 55, because Bhushan's "production processes" are insufficiently similar to SeAH's to yield fair overhead and SG&A values, *id.* at 48; *see id.* at 48–51, while the record evidence is insufficient to conclude that "Bhushan actually produced OCTG" in meaningful quantities, to yield fair profit values, *id.* at 53–54. We disagree with SeAH.

Substantial evidence supports Commerce's determination that Bhushan's financial statements are the best available information on the record to calculate SeAH's surrogate financial ratios. Commerce found that Bhushan, unlike the other available options, "produce[d] identical merchandise" to SeAH, and further, that Bhushan has "financial statements [that] are publicly available and contemporaneous with the POI." J.A. 2964. Under the circumstances, this is sufficient. *See Qingdao Sea–Line,* 766 F.3d at 1386 ("Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."). Commerce acted in keeping with its "practice . . . to use, whenever possible, the financial statement of a producer of identical merchandise[.]" J.A. 2962; *see* J.A. 2204 (explaining that Commerce's "preference for using the financial statements of producers of identical merchandise is especially strong here because of the unique nature of OCTG among the wide range of pipe products . . . [s]pecifically it is among the most expensive and profitable"); *see also* 19 C.F.R. § 351.408(c)(4) (2013) (providing that, to value surrogate financial ratios, Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country"). Accordingly, substantial evidence supports Commerce's selection of Bhushan's financial statements as the best available information on the record. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010) ("Commerce has broad discretion to determine the best available information.").

SeAH's counterarguments are unpersuasive. First, SeAH argues that Commerce has acted against its "established . . . preference for using the statements of surrogate-country producers that have production processes similar to those of the NME producer being examined." Appellant's Br. 48. However, Commerce's mandate is to use the

"best available information" on the record. 19 U.S.C. § 1677b(c)(1). Commerce will "reject financial statements of surrogate producers whose production process is not comparable to the respondent's production process *when better information is available*." J.A. 2205 (emphasis added, internal quotation marks and footnote omitted). Where, as here, Commerce finds that better information is not available, *see* J.A. 2963–64 (finding it acceptable to use Bhushan's financial statements because "no superior option was available on the record"), Commerce may use the financial statements of "companies with differing integration levels," J.A. 2964; *see Home Meridian Int'l Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014) ("The data on which Commerce relies to value inputs must be the 'best available information,' but there is no requirement that the data be perfect.").[5] While SeAH cites to several antidumping investigations and reviews to support its argument, these determinations only confirm that Commerce's "best available information" analysis is context and fact dependent. *See Dorbest*, 462 F. Supp. 2d at 1268 (explaining that the best available evidence determination is "one of comparison," requiring "Commerce to select, from

---

[5]    SeAH argues, in a footnote of its brief, that Commerce should have used the financial statements of APL Apollo Tubes, Ltd. ("Apollo") instead of Bhushan's, because Apollo's subsidiary has a "license to produce OCTG." Appellant's Br. 52 n.78. "Arguments raised only in footnotes are waived." *Ford Motor Co. v. United States*, 926 F.3d 741, 760 n.12 (Fed. Cir. 2019) (internal quotation marks, alterations, and citation omitted). We decline to exercise our discretion to consider SeAH's argument, as it amounts to a request for us to reweigh the evidence. *See Downhole Pipe*, 776 F.3d at 1377 (explaining that we do not "reweigh the evidence" or "reconsider questions of fact anew") (internal quotation marks and citation omitted).

the information before it, the best data for calculating an accurate dumping margin").[6]

Second, SeAH argues that because Bhushan's production processes are different from SeAH's, use of Bhushan's financial statements "distort[s] . . . overhead costs and SG[&A] expenses[.]" Appellant's Br. 53; *see* J.A. 2963 (characterizing SeAH as a "semi-integrated producer"). Commerce acknowledged that Bhushan's level of integration was different from SeAH's, but found that production of identical merchandise was more important than having identical production processes to calculate OCTG dumping margins as accurately as possible. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (explaining that "the basic purpose of the [anti-dumping]

---

[6]     *See, e.g.*, *Certain Oil Country Tubular Goods from the People's Republic of China*, Issues & Decision Mem., A-570-943, POR May 19, 2010–Apr. 30, 2011 (Dec. 5, 2012) (adopted in 77 Fed. Reg. 74,644 (Dec. 17, 2012)) at 20 (explaining that "[f]or purposes of selecting surrogate producers, [Commerce] examines how similar a proposed surrogate producer's production experience is to the NME producer's," but "is not required to duplicate the exact production experience of an NME producer, nor must it undertake an item-by-item analysis in calculating factory overhead" (internal quotation marks and citation omitted)); *Certain Circular Welded Carbon-Quality Steel Pipe from the People's Republic of China*, Issues & Decision Mem., A-570-870 POI Oct. 1, 2000–Mar. 31, 2001 (May 15, 2002) (adopted in 67 Fed. Reg. 36,570 (May 24, 2002)) at cmt. 5 (explaining that "[w]hile relying on [an integrated producer's] data [for a non-integrated producer] may be appropriate in other circumstances, in this case [Commerce] do[es] not need to use its financial information as [Commerce had] four other surrogate companies which more closely approximate the . . . respondents experience").

statute" is "determining current margins as accurately as possible"); *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("The 'best available information' . . . may constitute information from the surrogate country that is directly analogous to the production experience of the NME producer . . . or it may not."); *see also* J.A. 2204 (explaining that Commerce's preference for using "the financial statements of producers of identical merchandise is especially strong" for OCTG, given the "unique nature of OCTG"), 2205 (explaining that "level of integration is one factor" Commerce considers "[i]n analyzing the comparability of . . . production process[es]"), 2998 (finding that while "Bhushan operates at a different level of integration than [SeAH]," "Bhushan['s] financial statements are appropriate . . . because Bhushan produces identical merchandise"). We do not "evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted). We "will not second-guess Commerce's choice." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313 (Ct. Int'l Trade 2007) (explaining that "[w]here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative," substantial evidence review means that we "will not second-guess Commerce's choice"); *see Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

Third, SeAH argues that "the record is not clear as to whether Bhushan actually produced OCTG," Appellant's Br. 53, such that "when Commerce calculated a profit ratio based on Bhushan's financial statements, its result was not in any way an OCTG profit figure," *id.* at 54. The CIT,

however, found that SeAH had "failed to exhaust its administrative remedies" on this point and declined to consider the argument.  *SeAH II*, 269 F. Supp. 3d at 1350 (citing 28 U.S.C. § 2637(d) (requiring the "exhaustion of administrative remedies")); *see* Reply Br. 18 (conceding that SeAH raised this argument only on remand).  In reply, SeAH asserts that requiring exhaustion "would impose an impossible burden upon [SeAH]," because remand "presented a different issue."  Reply Br. 18–19.  However, SeAH, while aware the CIT had found failure to exhaust, did not raise the exhaustion issue or its "impossible burden" argument in its opening brief.  *See generally* Appellant's Br.  SeAH's exhaustion arguments are, accordingly, waived.  *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) ("[W]e see no reason to depart from the sound practice that an issue not raised by an appellant in its opening brief . . . is waived.").  The CIT did not abuse its discretion in requiring exhaustion; like the CIT, we decline to consider the merits of SeAH's argument that Bhushan did not produce OCTG.  *See Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007) (applying an abuse of discretion standard to the CIT's exhaustion determinations).  Accordingly, Commerce's selection of Bhushan's financial statements is supported by substantial evidence and otherwise in accordance with law.

## III. Commerce's Use and Selection of Surrogate Values for Inland Insurance Is Supported by Substantial Evidence and Otherwise in Accordance with Law

In its *Final Determination*, Commerce did not "deduct a surrogate value from [SeAH's constructed export price] to represent domestic inland insurance."  J.A. 2227.  Commerce reasoned that, while the record included a contract between SeAH and a freight forwarder ("the Freight Forwarder Contract") that suggested the freight forwarder had provided inland insurance, this did not "constitute[] an 'insurance contract' that would require a separate surrogate value" because "it is not uncommon for [freight forwarders]

16          SEAH STEEL VINA CORPORATION v. UNITED STATES

to bear the risk of loss on the shipments they handle." J.A. 2227. The CIT remanded "for further explanation" from Commerce concerning "why it believes that [freight forwarders] [generally] carry the risk of loss" or why SeAH's freight forwarder, specifically, did not. *SeAH I*, 182 F. Supp. 3d at 1331. On remand, Commerce found that, because SeAH's contract with its freight forwarder "includes language to insure [SeAH] against 'any accidental or any damage to cargoes' for the full amount of the invoice," the "freight contract" was an "insurance contract." J.A. 2957. Accordingly, Commerce "included a surrogate value for domestic inland insurance in [its] revised margin calculations." J.A. 2957. Commerce used the only "available surrogate value source" on the record, the inland insurance value of Agro Dutch, a preserved mushroom producer, with some adjustment for inflation, since the value was from 2004–2005. J.A. 2958. The CIT sustained Commerce's decision to include a surrogate value for domestic inland insurance, but remanded for Commerce either for further explanation or reconsideration of its "rel[iance] on the A[gro] Dutch surrogate value." *SeAH II*, 269 F. Supp. 3d at 1357–58 (sustaining use of a surrogate value while remanding for further explanation of Commerce's reliance on the Agro Dutch surrogate value).[7] On

---

[7] SeAH does not directly challenge Commerce's use of the Agro Dutch surrogate value. *See* Appellant's Br. 7–15, 43–46. Instead, SeAH argues that Commerce violated SeAH's due process rights and Commerce's regulations by not allowing SeAH to submit additional information about inland insurance during remand proceedings. *Id.* at 47. Specifically, during its second redetermination, in response to SeAH's assertion that Agro Dutch's records were illegible, J.A. 3031, Commerce "placed on the record a more legible copy of the same [evidence]," J.A. 3033. SeAH asserts that, in so doing, "Commerce rejected [SeAH's] request . . . to submit information concerning the actual cost

of inland insurance in India." Appellant's Br. 47. However, Petitioners placed the Agro Dutch data on the record during the investigation, clearly labeled for "calculation of surrogate value for [SeAH's] domestic inland insurance." J.A. 1506 (submitting Agro Dutch's information to "value[] [SeAH's] domestic inland insurance"), 1519 (Agro Dutch values). SeAH, therefore, had the notice and opportunity to respond but did not. J.A. 3036 (explaining that the deadline to submit factual information for the factors of production was January 17, 2014; that "rebuttal factual information to value factors was due on January 27, 2014"; and that, while Petitioners had submitted the relevant insurance data by January 17, 2014, SeAH did not rebut or request a more legible version by January 27, 2014); *see QVD Food*, 658 F.3d at 1324 ("[T]he burden of creating an adequate record lies with [interested parties] and not with Commerce." (internal quotation marks and citation omitted)). "Commerce's rejection of untimely-filed factual information does not violate a respondent's due process rights when the respondent had notice of the deadline and an opportunity to reply." *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1353 (Fed. Cir. 2015). As such, Commerce did not abuse its discretion in declining to reopen the record for SeAH's untimely filed factual information, *see Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (explaining that Commerce does not abuse its discretion when it declines "to reopen the record after it had long since closed" for evidence the respondent could have but did not previously provide), nor was it required under 19 C.F.R. § 351.301(c)(4) to allow belated rebuttal of evidence already on the record, *see PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012) (determining that the CIT improperly "intruded upon Commerce's power to apply its own procedures for the timely resolution of antidumping reviews").

remand, Commerce further adjusted its constructed export price calculation, since the Agro Dutch value also included marine insurance, but confirmed its decision to continue using the Agro Dutch data because it "reasonably meets Commerce's criteria for the selection of [surrogate values]." J.A. 3021; *see* J.A. 3019–21. The CIT found this sufficient and sustained Commerce's determination. *SeAH III*, 332 F. Supp. 3d at 1326. SeAH argues that "Commerce's determination to include an additional surrogate amount for Indian inland insurance costs is contrary to law and unsupported by the record evidence." Appellant's Br. 44 (capitalization normalized). We disagree with SeAH.[8]

---

[8]    SeAH briefly argues that, because Commerce found in its *Final Determination* that SeAH's Freight Forwarder Contract "was not an insurance contract," then changed its position on remand, its decision is "not entitled to deference" and should be reviewed "de novo" as a matter of "contract interpretation." Appellant's Br. 43–44. This is incorrect. We review Commerce's factual findings, including on remand, under a substantial evidence standard. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Whether SeAH paid overland freight insurance is a question of fact; its Freight Forwarder Contract is evidence toward that fact. *See PSC VSMPO-Avisma*, 688 F.3d at 760 (explaining that a submission that "clearly assumes the weight of evidence and, as such, amounts to [d]ata or statements of fact in support of allegations" is "factual information" (internal quotation marks and citations omitted)); *see also* 19 C.F.R. § 351.102(21)(i), (ii) (defining "factual information" in antidumping proceedings before Commerce as "[e]vidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires" or "in support of allegations," or "to rebut, clarify, or correct such evidence submitted by any other interested party"); J.A. 703–06 (SeAH's Freight Forwarder Contract,

Substantial evidence supports Commerce's determination that SeAH's Freight Forwarder Contract included domestic inland insurance separate from transportation costs. The express terms of SeAH's Freight Forwarder Contract included an insurance clause with fees for cargo safety. J.A. 705 (providing that "[i]f there is any accident or any damage to cargoes [the freight forwarder] has responsibility to compensate to [SeAH] 100% of the invoice amount"); J.A. 705–06 (providing that agreed price included both "transportation charge from SeAH's factory to [port]" and "[f]ees for cargo's safety"). Accordingly, Commerce's decision to account for such fees in its export price determination is supported by substantial evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (providing that substantial evidence includes "reasonable inferences from the record").

SeAH's counterarguments are unpersuasive. SeAH argues that Commerce's inclusion of a surrogate value for inland insurance is contrary to "well-established common-law principles" in India that "[hold] common carriers liable for any damages suffered by the cargo while the cargo is in their possession." Appellant's Br. 44. SeAH fails to establish how this is relevant to our interpretation of SeAH's contract. *See* J.A. 704 (providing that Vietnamese civil law governs SeAH's Freight Forwarder Contract). SeAH offers no further evidence or explanation as to its actual expenses. *See Nan Ya Plastics*, 810 F.3d at 1344 (explaining that Commerce need not "'prove a negative' about a respondent's pricing behavior if that respondent fails to provide evidence that would yield more representative calculations of its pricing behavior"); *QVD Food*, 658 F.3d at 1324 ("[T]he burden of creating an adequate record lies

---

submitted in response to Commerce's supplemental questionnaire in appendix "SC-5"). Accordingly, substantial evidence is the appropriate standard of review.

with [interested parties] and not with Commerce." (second alteration in original, citation omitted)).

SeAH further argues that, in selecting surrogate values, "Commerce was required to determine the cost in India of an agreement in which a carrier undertook to transport merchandise and to bear the cost of any losses during transport" and that Commerce's finding any additional cost "is directly contrary to Indian law." Appellant's Br. 45–46. This, however, misapprehends what Commerce was required to do. Commerce was required to "construct a hypothetical market value of [SeAH's] product" using surrogate values, *Downhole Pipe*, 776 F.3d at 1375 (internal quotation marks and citation omitted), not a hypothetical price using surrogate laws, *see Nation Ford*, 166 F.3d at 1377 ("[A] surrogate value must be as representative of the situation in the NME country as is feasible[.]" (internal quotation marks and citation omitted)); *id.* at 1378 ("There is no reason . . . to incorporate the distortions in the [surrogate] market into a hypothetical [respondent] market[.]"). Accordingly, Commerce's inclusion of a separate surrogate value for inland insurance is supported by substantial evidence and otherwise in accordance with law.

## IV. Commerce's Allocation Methodology for B&H Is Unsupported by Substantial Evidence

In its *Final Determination*, Commerce concluded that the *Doing Business Report* "represent[s] the best information available on the record for the valuation of B&H costs," J.A. 2192, as a "contemporaneous, broad market average," J.A. 2193. Commerce found it "appropriate" to allocate B&H cost by weight, i.e., it divided the surrogate B&H values from the *Doing Business Report* by ten metric tons, because ten metric tons was the example shipping container "weight used in the *Doing Business* [*Report*]," then multiplied it by the weight of SeAH's shipments, assuming that B&H cost was proportional to shipment weight. J.A. 2194 (citation omitted). Commerce explained

this decision was "consistent with the original data's reporting basis" thereby "maintain[ing] the relationship between cost and quantity from the [*Doing Business Report*]." J.A. 2194–95 (citation omitted). The CIT "remand[ed] for further explanation" as to why Commerce presumed that SeAH's "B&H costs would increase proportionately with the weight of the exported and imported goods." *SeAH I*, 182 F. Supp. 3d at 1343. On remand, Commerce pointed to record evidence that, it said, suggested SeAH's "B&H costs can increase proportionately with the weight of the shipment." J.A. 3009. The CIT remanded again to Commerce, with instructions to address SeAH's counterarguments. *SeAH II*, 269 F. Supp. 3d at 1365. Commerce "continue[d] to find [its] allocation methodology . . . reasonable." J.A. 3024. The CIT sustained Commerce's determination as "supported by substantial evidence." *SeAH III*, 332 F. Supp. 3d at 1329. SeAH argues that Commerce's by-weight allocation methodology "resulted in per-unit [B&H] values," Appellant's Br. 60 (capitalization normalized), that were contrary to record evidence and therefore "not reasonable," *id.* at 64.[9] We agree with SeAH that Commerce's by-weight allocation methodology for B&H costs is, as applied here, unsupported by substantial evidence.

First, Commerce concluded that its "allocation methodology was reasonable given how [the] *Doing Business* [*Report*] calculated B&H costs." J.A. 3042. The *Doing Business Report* aggregated data from "[l]ocal freight forwarders, shipping lines, customs brokers, port officials[,] and banks," to "measure the time and cost (excluding tariffs) associated with exporting and importing a standardized cargo of goods by sea transport." J.A. 1998. The *Doing*

---

[9]     SeAH states that "[f]or purposes of this appeal, [it] accept[s] that Commerce could properly rely on the total costs identified in the *Doing Business Report*." Appellant's Br. 63.

*Business Report* assumed that the "traded goods" travel in a "dry-cargo, [twenty-]foot, full container load," "weigh[ing] [ten] [metric] tons and . . . valued at $20,000." J.A. 1998. From this, Commerce inferred that "the *Doing Business* [*Report*] calculation assumed a fixed weight for purposes of calculating B&H costs," such that price and weight are "dependent upon one another." J.A. 3044. This inference, however, "simply is not representative of reality." *DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338, 1351 (Ct. Int'l Trade 2014) (quoting *CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271, 1295 (Ct. Int'l Trade 2014)). Commerce itself notes that the *Doing Business Report* "does not provide information showing how [its ten-metric-ton] assumption was developed" such that Commerce is "not able to go behind [the] *Doing Business* [*Report*] to analyze their assumption further." J.A. 3043 (citation omitted). "Go[ing] behind" the report is not required: The *Doing Business Report* expressly provides that it records "documents required *per shipment*," J.A. 1999 (emphasis added); *see* J.A. 1999 (providing that "[i]t is assumed that a new contract is drafted per shipment" and that "[d]ocuments that are requested at the time of clearance but that are valid for a year or longer and do not require renewal per shipment . . . are not included"). It further provides that its "[c]ost" figures measure "the fees levied on a [twenty]-foot container." J.A. 1999. It does not describe cost as dependent on the weight of that container. *See* J.A. 1999. Accordingly, Commerce's assumption that "the *Doing Business* [*Report*] calculation assumed a fixed weight for purposes of calculating B&H costs" is without reasonable basis. J.A. 3044; *see DuPont Teijin*, 7 F. Supp. 3d at 1351 (explaining that "Commerce's [by-weight B&H allocation] methodology incorrectly assumes that a shipment weighing less will incur lower document preparation and customs clearance costs, while a shipment weighing more will incur higher preparation costs"). If Commerce seeks, as it asserts, to "be internally consistent with the original data's reporting basis," J.A. 3028, then it

must reconsider its decision, *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

Second, Commerce concluded that "it is appropriate to value B&H on a weight basis because this basis reflects [SeAH's] own service contract"; specifically, SeAH's Freight Forwarder Contract "provides evidence that [SeAH] itself paid certain B&H charges on a weight basis." J.A. 3026. SeAH's Freight Forwarder Contract provided both prices per container and ton. J.A. 705 (providing "[p]rice of container" for forty foot and forty-five foot containers and "[p]rice of [b]ulk [c]argoes" by "[t]on"). These prices were meant to include customs clearance, J.A. 706, and other services that, according to Commerce, "[c]learly . . . include document preparation," J.A. 3040; *see* J.A. 705 (providing for "[a]rranging and finishing Customs Declaration, clearing customs at port, customs inspection" and "[p]aying port charges and any kind[] [of] fee[s] that relate to [p]ort formalities"). However, the prices per ton for bulk cargo also expressly provide that they are for "transport from SeAH" to regional ports, with price varying by destination, suggesting those fees are for transport (i.e., freight forwarding). J.A. 705; *see CS Wind*, 971 F. Supp. 2d at 1295 ("Common sense indicates that a half-full, twenty-foot container would incur the same document preparation expenses as a full twenty-foot container of a single type of good."). The contract does not otherwise explain why or when per container or per ton price might be charged. *See* J.A. 704–06. Commerce conceded that SeAH's Freight Forwarder Contract "does not show how a Vietnamese company would charge for [B&H] services [separate from transportation]," but states that the contract is nonetheless "adequate to show that B&H costs can be incurred on a weight basis in Vietnam." J.A. 3040; *see* Gov't's Br. 20 (arguing that Commerce "reasonably determined that [B&H] costs should be allocated by weight"

because record evidence "indicat[es] that [SeAH's] costs are or could be allocated by weight"). While "the burden of creating an adequate record lies with [interested parties]," *QVD Food*, 658 F.3d at 1324, Commerce must, nonetheless, support its decision with substantial evidence, *Downhole Pipe*, 776 F.3d at 1374; *see China Nat'l Arts & Crafts Imp. & Exp. Corp. v. United States*, 771 F. Supp. 407, 413 (Ct. Int'l Trade 1991) ("Guesswork is no substitute for substantial evidence in justifying decisions."). Commerce has failed to do so here. *See CS Wind*, 971 F. Supp. 2d at 1295 (finding Commerce's by-weight B&H allocation methodology unsupported by substantial evidence where "Commerce has failed to explain why document preparation [and customs clearance] costs, as opposed to other B&H fees, would change depending on the size or weight of the shipment"). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

Third, Commerce supported its by-weight allocation methodology with reference to record evidence that "shows that at least some Indian B&H costs vary by weight." J.A. 3042. Specifically, Commerce cited to a supplemental questionnaire response, submitted by a mandatory respondent, GVN Fuels Ltd. ("GVN"), in another OCTG antidumping duty investigation. J.A. 1763. The supplemental response disclosed five separate categories of B&H charges: "Agency Charges," "Shipping [B]ill [C]harges," "Dock Fee," "Bill of [L]ading [C]harges," and "Other [C]harges." J.A. 1764. Of these, two categories ("Agency Charges" and "Other [C]harges") were reported at cost "per metric ton." J.A. 1764. Commerce concluded that "due to the uncertainty as to the exact nature of [the two by-weight] charges, [Commerce] cannot state definitively that it did [include document preparation and customs clearance], just as [SeAH] cannot be certain that it did not." J.A. 3042. This is insufficient. *See China Nat'l Mach. Imp.*

*& Exp. Corp. v. United States*, 264 F. Supp. 2d 1229, 1240 (Ct. Int'l Trade 2003) ("Conjectures are not facts and cannot constitute substantial evidence."). Further, the evidence Commerce cites does not support its conclusion. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) ("To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence." (internal quotation marks and citation omitted)). Specifically, Commerce cites to a supplemental questionnaire response in which the respondent, to answer Commerce's questions, reported some undefined B&H costs "per metric ton." J.A. 1764. GVN made no representations that it incurred or paid those costs by the metric ton. *See* J.A. 1763–65. To the contrary, GVN had "calculated the per metric ton rate identifiable to . . . certain [B&H-related] invoices" itself, and, when Commerce sought further clarification of what the specific expenses were and how GVN had calculated the rate, GVN provided itemized costs. J.A. 1764. GVN did not define "Agency Charges," but explained "Other [C]harges" were "expenses that could [not] be directly allocated or traced to a specific invoice," such that the total costs were "divided by the total quantity of the all [relevant] invoices" to allocate the costs. J.A. 1764. This does not establish that GVN paid any of the listed B&H costs by weight, but rather that the company reported its costs to Commerce by weight. Accordingly, Commerce's B&H allocation methodology is unsupported by substantial evidence. *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009) ("There must be at least enough evidence to allow reasonable minds to differ.").

The Government's primary counterargument is unpersuasive. The Government argues that "[g]iven the mixed record of evidence showing that [SeAH's and] Indian [B&H] costs" were "sometimes charged [and paid] by weight," Commerce acted within its "discretion." Gov't's

Br. 36. However, the record here is not "mixed" or "conflicting," as the Government asserts. *Id.*; *see Cleo Inc. v. United States*, 501 F.3d 1291, 1298 (Fed. Cir. 2007) (describing evidence as "mixed" where there is evidence supporting two alternate conclusions). "Substantial evidence is more than a mere scintilla." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). As the CIT has already explained, we understand "that Commerce commonly converts all surrogate values into a per kilogram amount for use in calculating dumping margins," however, "its method of doing so here, based on the weight of the containers" is "unsupported by substantial evidence." *DuPont Teijin*, 7 F. Supp. 3d at 1351–52; *see CS Wind*, 971 F. Supp. 2d at 1295.

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. Accordingly, the Opinion and Order of the U.S. Court of International Trade is affirmed-in-part and reversed-in-part, and the case is remanded.

**AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED**